[Civ. No. 7066. Second Appellate District, Division Two.—March 15, 1932.]

IRMA FOXE, as Administrator, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

W. I. Gilbert for Appellant.

Rosenthal & Rosenthal for Respondent.

CRAIG, Acting P. J.—The respondent's intestate was injured while performing the duties of a brakeman upon a freight train operated by the appellant, in Los Angeles County, as a result of which he lost his life. In an action instituted under the federal Employers' Liability Act by said representative, judgment was rendered upon the verdict of a jury, from which judgment the employer appealed.

During a dark, rainy morning in the fall a crew consisting of an engineer, fireman, conductor and three brakemen, who

had left San Fernando destined to Los Angeles, were ordered to convey a train of empty cars to Roscoe, leave them on a siding near Penrose Avenue, obtain a train of loaded rock-cars from a branch of said siding, and haul the same to the destination mentioned. The conductor testified as to local conditions, general directions, appliances and movements of the train from a diagramatic plat which was introduced in evidence, and is herein reproduced as an aid to an understanding of the conception of this and other witnesses of the occurrence in controversy.

For purposes of the trial it was ordered that on the general diagram "the main line be marked 'A', the spur track will be marked 'B', and the rock-spur will be marked 'C' ". A switch from the main line to sidings "B" and

"C", designated as "XI", was approximately 75 feet westerly from Penrose Avenue; a switch "X" from the side track to said rock-lead "C", was approximately 125 feet westerly from the first; a derail was placed about 50 feet from switch "X2", and the loaded cars stood at the extreme westerly end of the said rock-lead track. A switch-light signal on "XI" indicated according to a red or green light whether or not a train proceeding westerly along the main line would be diverted. There was evidence that switch "X2" was not at the time furnished with a light. Rear brakeman Slingluff, from the caboose at the end of the train, and brakeman Moore, signaled with lanterns for the train to move backward upon the opening of the main-line switch, "XI", toward spur-track "B", but for some reason unexplained definitely by the record, it followed the northerly line, with the resulting collision and injury mentioned.

Usages of the defendant company, orders received and given by the conductor, and the respective duties of each brakeman, comprised considerable of the testimony and are afforded extensive discussion by the appellant, toward the ultimate demonstration by processes of exclusion of an insufficiency of the evidence to support the verdict and judgment. In this behalf it is argued that the deceased was injured through hazards which he legally assumed as an employee of the appellant, and from dangerous conditions which were obvious to an ordinary person of prudence and which the deceased fully knew and appreciated; that each brakeman was assigned to a specific duty, and that he was dependent upon the conductor for instructions, under rules and regulations of the company. There was evidence tending to show that the conductor did not know upon arrival at San Fernando the destination of the empty cars, but it also appears that he thereafter examined his instructions, and that the train crew all understood that they were to be deposited on the spur-track "B" at Roscoe, and the loaded rock-cars removed from track "C" for transfer to Los Angeles. There was substantial positive evidence that, although in theory the brakemen were designated for convenience according to positions on the train, no rule, regulation, custom or usage classified them or required such distinctions in actual service. According to the conductor,

"there were just three things to do, and that was, to spot a train, after it passed over the main-line switch to back in, the derail switch on the spur track B was to be turned, the switch-lead to spur-track C should be set, and the main-line switch opened—and there were three men to do that". Each did a part, and was not directed to perform any particular thing. Following an inspection to insure a clear way signals to back were given; Slingluff was on the rear of the train, Moore and Kraus were at different points along the sidings, and the conductor had stepped toward the main line, intending that the cars should be placed on track "B". The train was moving but about six miles per hour, and the air-brakes were in perfect condition. Kraus swore: "I saw the caboose hitting the switch No. 2, going wrong—it ought to have gone on the spur track—and the switch evidently wasn't lined or something, and the caboose went on this track C instead of going on the right track. . . . I gave a violent washout signal to stop, but he did not stop; he had about four cars between here—from the time I gave the stop signal and before the impact occurred. . . . I saw two men give the back-up signal. It is true that they were standing between the main-line switch and the switch that afterwards proved to have been thrown wrong. . . . All I can say is that he had time to stop all right if he had used the air." The engineer testified that he had backed about 200 feet when he received signals to stop. The deceased was found between the caboose and the car of the other train. ▆▆ We are not authorized to say as a matter of law that the jury, observant of the witnesses and of the circumstances, were unjustified in concluding that injuries resulting from an unlighted switch, backing a train upon the wrong track, over a switch improperly set, were not proximately caused by negligence of the defendant's employees for which the deceased was unaccountable. ▆▆ When different inferences may be drawn from all of the evidence, it must be viewed in a light most favorable to support the verdict, and the conclusion of the jury is conclusive. (*Depaoli* v. *Claus*, 110 Cal. App. 145 [293 Pac. 881].)

▆▆ It is further suggested that the presumption that a man ordinarily takes care of his own concerns should be applied here, in view of the dangers incidental to such ser-

vice, and the assumption by an employee of the ordinary risks of his duties. It is observed, however, that contributory negligence was not an issue upon the trial, nor does the record tend to disclose the existence of like perils at the Roscoe siding such as might instill precaution against anticipated recurrences of similar dangers. The rule advanced by appellant that evidence merely sufficient to dispel the presumption that the deceased exercised ordinary care can be said to raise no conflict in the absence of further showing by the plaintiff (*Larrabee* v. *Western Pac. Ry. Co.,* 173 Cal. 743 [161 Pac. 750]; *Williams* v. *Hasshagen,* 166 Cal. 386 [137 Pac. 9]), is not in conflict with what has been said. It is overcome by undisputed evidence of safe conditions of employment under customary and usual operations of the same appliances. Under the federal Employers' Liability Act, applicable to interstate commerce in such a case, "an employee who places himself in a position of danger does not thereby necessarily assume the risk of injury from the want of care of his employer. He has the right to act upon the presumption that the master will exercise ordinary care in the conduct of his business to prevent anything being done which will increase the danger incident to the employment (*Morgan* v. *J. W. Robinson Co.,* 157 Cal. 348 [107 Pac. 695]); and the question whether he assumed the risk was one for the jury." (*McComb* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 110 Cal. App. 303 [294 Pac. 81]; *Thomas* v. *Southern Pac. Co.,* 116 Cal. App. 126 [2 Pac. (2d) 544].)

A ruling and exception to the testimony of an engineer, who had been discharged by the defendant after twenty-three years' service, as to the distance within which the train in question could have been stopped, assigns as error a failure to establish the sufficiency of his qualification as an expert witness. However, his evidence did not differ materially in its essentials from that of defendant's witnesses in this respect, and the jury were instructed that they should consider the credibility of the witnesses, their bias or prejudice, if any, the reasonableness or unreasonableness of their statements, and the degree of their intelligence. In the same regard exception was taken to the sufficiency of an hypothetical question propounded to the same witness in that it failed to take into account various details. But

since there is no conflict as to the fact that the train could have been stopped before it reached the loaded cars, the appellant fails to show wherein it was prejudiced by his testimony.

A careful perusal of instructions given to the jury upon assumption of risk seems to reveal no misleading or serious deviation from statutes governing in such a case. The rule has repeatedly been announced in this state, and is no longer in dispute. Certain offered instructions which were refused assumed facts not in evidence, and may have been properly refused as not in accord with the facts or the law of the instant case.

From what has been said, minor technical questions raised by the appellant become moot.

The judgment is affirmed.

Thompson (Ira F.), J., and Fricke, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 14, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 12, 1932.